[Civ. No. 16838. First Dist., Div. Two. June 19, 1956.]

SHIELDS COMPANY, INC. (a Corporation), Respondent, v. COLLINS ELECTRICAL COMPANY, INC. (a Corporation), Appellant.

Mazzera, Snyder & DeMartini, Loraine B. Early and J. Calvert Snyder for Appellant.

Lawrence A. Cowen and Leo V. Killion for Respondent.

KAUFMAN, J.—This is an appeal from a judgment in the sum of $4,225.79 rendered by the Superior Court in and for the County of Marin in favor of respondent Shields Company, Inc., and against Collins Electrical Company, Inc., a corporation. Both companies were subcontractors under a prime contract which had been awarded to the Del E. Webb Construction Company to construct an aircraft shop building at Travis Air Force Base near Fairfield-Suisun, California.

On August 18, 1952, respondent was awarded a subcontract in the amount of $197,834.02 to do certain mechanical work as set forth in detail in the contract which also included by reference certain enumerated sections of the specifications. Respondent was engaged in the general plumbing, heating and sheet metal contracting business in San Rafael, California.

Appellant, a general electrical contractor with its principal place of business in Stockton, California, on August 22, 1952, was awarded a subcontract to do the general electrical work on a form similar to that used for respondent, in which the work was described as "all electrical work, interior, and electrical distribution system, aerial complete, installed according to plans, specifications, and addenda . . ." "This work includes without limitation all General and Special conditions of the Specifications, and section 31, 32 and 41 . . . motors,

motor controls, switchboards . . ." The contract price was $68,850.54.

In the subcontract of respondent there was the phrase "electrical work as required under mechanical work" set forth in a series of items to be furnished by respondent, such as "steel racks, blow-off tank, bilge set, boiler room trenches and iron work, heating units, gauges," etc.

A controversy arose during the course of construction between the superintendents of the two subcontractors as to which company was to supply certain items of electrical equipment—namely, starters, a generator set, rheostat, and a control panel. Schwall, superintendent for Collins, refused to supply them, and the work was being held up. Schwall took up the matter with the superintendent of Del Webb, the prime contractor, who told Wilcox, respondent's superintendent, that it was Shields' duty to supply the items, that if Wilcox did not do something about it its payment would be withheld. Respondent then furnished the items which were installed by appellant. When Wilcox delivered this equipment he insisted that Schwall give him a purchase order for it, which he refused to do. Wilcox then prepared a receipt which Schwall signed, dated September 24, 1953, and reading as follows: "We have received various starters also control panels and accessories for spray booths and air compressor on Aircraft Shops at Travis A.F.B. pending further classification of the specs." Some additional material was delivered on October 20, 1953, receipt of which was acknowledged by Collins.

On September 24, 1953, Wilcox wrote to Del Turney, an officer of Shields Company, stating that he and the superintendent for Collins had "decided it was beyond us to decide and that rather than hold up the job I would move the panel up there and he would sign a tag showing that he had received it and the clarifying of the specs would be taken up by the heads of the companies," and that about twenty minutes later, Mr. Kuntz of Del Webb called, saying that Collins' superintendent was in his office, and asked if Wilcox would come over, as the three of them should get together on a deal. Wilcox asked who would interpret the specifications, and Kuntz replied that he would. Wilcox said he did not think that was right. Kuntz asked if he refused to give Collins the switchboard. Wilcox answered, "No, that their Supt. said he would sign for it." Kuntz then said he would stop Shields' payment, as it was his opinion that it was that company's work. Wilcox told him that he was asking for

clarification and had offered to supply it on receipt, pending clarification.

On December 24, 1953, respondent sent appellant four invoices for these items in a total sum of $6,087.01, claimed due from appellant. The invoices showed that 15 per cent overhead and 10 per cent profit had been added to each of the four sets of items to make up the above total. Each of these charges was dated August 27, 1953. A bill of particulars covering these items was by stipulation filed during trial for the convenience of the court in following the testimony.

The complaint for moneys in the instant case consisted of two counts, the first alleging that within the two years last past, appellant became indebted to respondent in the sum of $6,087.01 for goods, wares and merchandise sold and delivered to appellant at its special instance and request for which appellant agreed to pay. The second count alleged a book account for goods, wares and merchandise sold and delivered to appellant in the amount of $6,087.01, which has been owed since August 27, 1953.

The trial court found that the charging allegations in the first count were true except that the amount owed was $4,754.94. It also found that the allegations of paragraph II of the second cause of action were true except that the amount was $4,754.94 instead of $6,087.01. It made no finding in regard to the date of the book account, other than that it arose within the two years last past. The court further found that the items which were in dispute were shown upon the electrical plans and that under the specifications they were to be furnished by appellant; that respondent was forced to deliver them to appellant, and that the sum actually paid by respondent for them was the sum of $4,754.94, which was expended by respondent for the use and benefit of appellant. The allegations of the cross-complaint were found to be true, entitling appellant to a credit of $529.15.

Appellant contends that the findings of fact are not supported by the evidence. At the outset, however, appellant concedes that the finding that it was the duty of appellant to supply the items in dispute, cannot be attacked on the basis that it is outside the issues formed by the pleadings, since both parties offered testimony relative to the interpretation of the plans and specifications. (*Horton* v. *Horton*, 115 Cal.App.2d 360, 367 [252 P.2d 397].) Appellant also concedes that there is substantial evidence to support this finding.

It is urged that there is no evidence of any transaction between the parties in the county of Marin, and the trial court found the allegation true that appellant became indebted to respondent in the county of Marin. There being evidence to support the finding that appellant became indebted to respondent for goods sold and delivered at its special instance and request, there is also evidence to support the finding that appellant became indebted to respondent in the county of Marin, for that is respondent's principal place of business. (Civ. Code, §§ 1488, 1489; *Roos* v. *Jansen*,. 30 Cal. App.2d Supp. 773 [78 P.2d 476]; *Bank of Yolo* v. *Sperry Flour Co.*, 141 Cal. 314 [74 P. 855, 65 L.R.A. 90].)

■ It is asserted that there is no evidence that the goods were sold and delivered to appellant at its special instance and request. The memorandum signed by both parties' agents, showing that these items were delivered by respondent to appellant "pending further clarification of the specifications," following the dispute as to whose duty it was to supply them under the subcontracts, is some evidence that appellant received the items impliedly agreeing to pay for them if it was its duty to do so. Certainly the conduct of the parties does not give rise to the inference that respondent intended a gift to appellant. ■ As to the complaint that the trial court did not find the specific date when the obligation was incurred, it is sufficient that the court found that it accrued within the two years prior to the commencement of the action. (*Wagner* v. *El Centro Seed etc. Co.*, 17 Cal.App. 387 [119 P. 952].)

■ Appellant appears to be correct in its contention that there is no evidence to support the finding that appellant became indebted to respondent upon a book account for goods, wares and merchandise. There is no dispute as to what items were received by appellant from respondent, and it is conceded that a bill was received by appellant for these items. They were again listed in the bill of particulars which was filed by stipulation with the court. No books of account were introduced into evidence, nor did the only witness who testified as to the amounts charged appellant for these items use any book of accounts in testifying, or state that there were any entries in any books of account concerning these items. He was questioned by respondent's counsel only in regard to the items which he had set forth in the bill of particulars. ■ A book account is defined as "a detailed statement, kept in a book, in the nature of debit and credit,

arising .out of contract or some fiduciary relation.'' (1 Cal. Jur.2d 320, § 7.) ■ It is true, that in the absence of objection, a book account can be proved by secondary evidence presented by the plaintiff reading from his accounts (*Gille* v. *Anderson,* 34 Cal.App. 237 [167 P. 193]) but even that was not done in this case. Furthermore, appellant could not have objected to respondent's method of introducing this evidence since it was admissible as to the first count of the complaint.

■ However, the judgment may still be supported if there is substantial evidence to support the findings as to the first cause of action for the sum found to be due and owing to respondent was the same under each count, namely, $4,754.94. The second count may therefore be regarded as surplusage. (See *Costello* v. *Campbell,* 81 Cal.App.2d 452 [184 P.2d 315].)

■ Appellant contends that respondent was a volunteer who furnished the equipment without request to appellant who did nothing other than install it. The evidence reviewed above completely refutes this contention, for there was a showing of an implied contract to pay for the items if appellant's subcontract imposed upon it the duty to supply them.

It is urged that the finding of coercion is unsupported since the threat to cut off respondent's payments if he did not supply the items was made by the prime contractor, and not by appellant who had no authority over such payment. It was said in *Brahs* v. *Katcher,* 106 Cal.App.2d 657, 659 [235 P.2d 619], that it is well established that ''to render a payment involuntary and hence recoverable, there must be an actual or threatened exercise of power possessed or supposed to be possessed by the party receiving payment. (Citations.) The threat must be clear and direct. It is not sufficient that a threat might possibly be inferred.'' ■ But even if it be assumed that the evidence herein is not sufficient to show that the agent of the prime contractor and appellant's agent were acting in concert, the judgment can still be supported by the findings in regard to the first count of the complaint, as noted above.

Appellant argues at length that respondent was once paid for the items here in question since in making up its bid it estimated the cost of these items in arriving at the total of its lump sum bid, and that appellant did not interpret its subcontract as calling for these items, hence did not include them in its total. Respondent's superintendent did testify that since the specifications were ambiguous, he included some

of the disputed items in his bid, that it is necessary in preparing such estimates to put aside a certain amount for irregularities that come up. Since appellant has admitted that the finding that it was appellant's duty to supply the disputed items under the terms of its subcontract, is supported by substantial evidence, it is immaterial what estimates were made by either subcontractor as they are bound by the terms of their contracts.

Finally, appellant attacks the finding that the sum of $4,754.94 (the amount of the judgment) represents the sum that plaintiff actually paid for the items and that said sum was expended for the use and benefit of defendant. This finding discloses the basis of the amount arrived at in the preceding findings which are in the same amount. ■ Appellant maintains that the record does not establish that this sum was the cost to respondent.

Respondent's witness Turney was examined as to the bill of particulars which had been filed in court by stipulation. He was the only witness to testify as to prices and costs of these items. Appellant's counsel examining him in regard to the bill of particulars asked if the price of one item, a control panel, listed at $2,230 was the amount he had paid for it. He replied that it was not, that he couldn't answer exactly without documents, that he would say it was about $1,950. He stated that all of the items on the bill of particulars were in excess of the cost. On redirect examination, respondent's counsel· asked, ''These prices that are shown upon your bill of particulars, they are not list prices, are they? He replied: I think there is a percentage for handling; I think its the original billing, plus a percentage. Now, may be fifteen and ten, I don't know. I think I have those.'' Then on recross examination, appellant's counsel asked: ''In other words, you think you marked up these about twenty-five? A. No, I would say fifteen and ten, if anything, if we were selling them to somebody else, definitely they would be marked up fifteen and ten, fifteen overhead and ten percent for profit. Q. And that's your idea? A. *That would be the fair value of them; we were getting them for somebody else.*'' Appellant states in its brief that the judgment was arrived at by deducting from the total amount claimed one item on the bill of particulars (which the parties stipulated should not have been included) and the sum of $1,275.15 representing 15 per cent overhead and 10 per cent profit. From this sum of $4,754.94 the amount claimed by appellant in its

cross-complaint was subtracted. While the above testimony appears at first to be somewhat conflicting, it appears to be subject to the interpretation that the price stated for each item on the bill of particulars represented the original billing —the cost to respondent—plus 15 per cent overhead and 10 per cent profit. The trial court, according to appellant's statement, arrived at the amount of the judgment by subtracting these percentages, hence the finding that the cost of the items involved was $4,754.94 is supported by the record.

No prejudicial error appearing in the record before us, the judgment must be affirmed.

Judgment affirmed.

Nourse, P. J., concurred.

DOOLING, J.—I dissent, since I am satisfied that there is no substantial evidence in the record of the reasonable value of the property involved. The burden was upon the plaintiff to establish the reasonable value of the items sued for. The majority opinion after paraphrasing the testimony on this subject and quoting some of it concludes: "While the above testimony appears at first to be somewhat conflicting, it appears to be subject to the interpretation that the price stated for each item on the bill of particulars represented the original billing—the cost to respondent—plus 15 per cent overhead and 10 per cent profit."

I cannot agree with this conclusion. The vice of the testimony is not that it is "conflicting." It is in fact perfectly consistent. Its vice is that it shows on its face that the witness Turney was not testifying to facts which he knew or remembered, but only to his surmise, guess and conjecture. To demonstrate this I quote all of the testimony given by the witness on the subject:

"MR. SNYDER: Q. There was one thing that I was wondering, for example, on this bill of particulars you have one control panel, $2,230.00. Is that what you paid for it, Mr. Turney? A. No, it is not.

"Q. What did you pay for it? A. Well, offhand I can't say, but I would say about $1,950.00, somewhere around there. I would say offhand; I couldn't be exact, I couldn't tell exactly without documents.

"Q. Would you say that all of these items on this bill of particulars there are in excess of what you paid for them? A. I wouldn't say that they all are.

"Q. Would you say most of them are? A. I believe that they are, most of them.

"Q. Now, I note generator set, that was a unit purchased along with the compressor? A. I am not positive of that; it was a part of the compressor, I suppose, I can't tell you that.

"Q. You didn't bring any of your bills? A. I didn't bring any, no, I didn't.

. . . . . . . . . . . .

"MR. COWEN: Q. Mr. Turney, there is just one further question I would like to ask you. These prices that are shown upon your bill of particulars, they are not list prices, are they? A. I think there is a percentage there for handling; I think there is a percentage for handling. I think it's the original billing, plus a percentage. Now, maybe fifteen and ten, I don't know. I think I have those.

. . . . . . . . . . . .

"MR. SNYDER: Q. In other words, you think you marked up these about twenty-five percent? A. No, I would say fifteen and ten, if anything, if we were selling them to somebody else, definitely they would be marked up fifteen and ten, fifteen overhead and ten percent for profit.

"Q. And that's your idea? A. That would be the fair value of them; we were getting them for somebody else."

The witness frankly admitted: "I *think* it's the original billing, plus a percentage. Now, *maybe* fifteen and ten. I *don't know.*"

Unless the pure guess, surmise and conjecture of a witness who frankly testifies that he does not know the facts is to be given the dignity of substantial evidence this testimony cannot support a finding of cost or value.

Appellant's petition for a hearing by the Supreme Court was denied August 16, 1956.